UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVSIION

| MELINDA PHALIN, | ) | CASE NO. 1:17-cv-0926 |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Melinda Phalin, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). The parties have consented to my jurisdiction. ECF Doc. 14.

Because the ALJ did not correctly apply the applicable legal standards, the final decision of the Commissioner must be VACATED and the case REMANDED for further proceedings.

## II. Procedural History

On March 26, 2014, Phalin applied for disability insurance benefits and supplemental security income, alleging disability beginning September 1, 2011. (Tr. 142-149) The claim was denied initially on July 11, 2014 (Tr. 87-92) and after reconsideration on November 3, 2014. (Tr. 99-110) Phalin requested a hearing on November 13, 2014. (Tr. 111) Administrative Law Judge ("ALJ") Susan Giuffre heard the case on February 23, 2016. (Tr. 30-52) The ALJ found Phalin not disabled on April 8, 2016. (Tr. 14-24) The Appeals Council denied Phalin's request

1

for review, rendering the ALJ's decision final. (Tr. 1-3) Phalin instituted this action to challenge the Commissioner's final decision.

### III.     Evidence

#### A.     Personal, Educational and Vocational Evidence

Phalin was born on May 25, 1982 and was 33 years old at the time of the hearing. (Tr. 142) She lived with her mother, her mother's fiancé, and her two small children. (Tr. 36-37) Phalin completed high school and had past work experience as a cashier/clerk. (Tr. 23, 34-36)

#### B.     Relevant Medical Evidence [1]

On October 14, 2011, Phalin saw Nurse Practitioner Mary Griffith for a refill of her prescriptions. She complained of pain in her lower abdomen. Phalin reported blood sugar ranging from 90-150 mg/dl. Ms. Griffith diagnosed diabetes type I, uncontrolled. (Tr. 219-220)

At follow-up appointments with Ms. Griffith in January, April, and May 2012, Phalin had normal foot examinations. (Tr. 492-493, 496) In May 2012, Phalin learned that she was pregnant. (Tr. 491)

In October 2012, treatment notes show an $A_1c$ level of 4.5. (Tr. 364) A treatment note from December 2012 states that Phalin was not at risk for falling. (Tr. 385) Phalin had normal foot examinations with Nurse Griffith in December 2012 and March 2013. (Tr. 489-490) At a doctor's appointment in June 2013, Phalin reported that her blood sugars were well controlled during pregnancy due to persistent nausea and very little eating. (Tr. 333)

---

[1] Phalin raises arguments related only to the contested impairment issues related to her diabetes. Recitation of the medical records concerning her other impairments is not necessary because she has abandoned issues relating to other impairments. ECF Doc. 16, Page ID# 1773.

2

Phalin met with Todd Wagner, M.D., on March 28, 2013 complaining of lower extremity pain and paresthesias. Phalin's A$_1$c level was 9.2%. Dr. Wagner adjusted Phalin's dosage of Gabapentin and counseled her that it might not take effect for two to three weeks. (Tr. 487)

In April 2013, Dr. Wagner referred Phalin to Nurse Practitioner Colleen Pomaro at the MetroHealth Medical Center's endocrinology clinic. (Tr. 369-370) Treatment notes indicate that Phalin was initially diagnosed with type 1 diabetes mellitus in 1996 at age 14. Metformin had been prescribed after one month due to lack of improvement. Phalin denied having ever been instructed on diabetic diet or engaging in any regular exercise. (Tr. 370) A foot examination was normal, with Phalin having intact sensation, normal pulses, and normal monofilament testing. (Tr. 372) Nurse Pomaro diagnosed type 1 diabetes mellitus of 17 years duration, complicated by DPN ("diabetic peripheral neuropathy) and changed plaintiff's insulin medication. (Tr. 374)

On April 26, 2013, Phalin followed-up with Nurse Pomaro. (Tr. 360) Phalin reported constant fatigue, numbness and tingling of legs and feet. (Tr. 361) She reported small changes in diet and decreasing her cigarette use. (Tr. 365) A foot examination was normal. (Tr. 364) Nurse Pomaro continued the same dose of insulin. (Tr. 365)

In May 2013, Phalin went to the emergency department for chest pain and a rash. (Tr. 345) An EKG was normal. (Tr. 346) Neurologic and extremity examinations were unremarkable. (Tr. 345) In June 2013, Phalin established care with Dr. Corinna Falck-Ytter at MetroHealth Medical Center. Phalin reported that she would like to improve her diabetes self-management. She was "most troubled" by severe pain in both feet. (Tr. 333) She carried her daughter around a lot. (Tr. 334) She reported checking her insulin four times daily and using 10 units of Novolog before she ate and 20 units of Lantus at night. (Tr. 333) Dr. Falck-Ytter

3

diagnosed type 1 diabetes mellitus, with complications, uncontrolled. He counseled Phalin to stop smoking and to learn carb counting again. He set an $A_1c$ goal of less than 7%. (Tr. 335)

Phalin returned to Dr. Falck-Ytter in July 2013 with complaints of ongoing loose stools and "a lot of foot pain." Phalin was still smoking but had been working hard on eating better. (Tr. 327) Dr. Falck-Ytter noted that Phalin was not at risk for falls. (Tr. 326) Phalin did a "tremendous job of getting her readings improved" and reported that her $A_1c$ readings were around 7% or less now. (Tr. 328) Dr. Falck-Ytter prescribed Lyrica for neuropathy. (Tr. 328)) She referred Phalin to physical therapy. (Tr. 320)

Plaintiff was ambulating independently at physical therapy in August 2013. (Tr. 305)

Phalin returned to Dr. Falck-Ytter on October 15, 2013. Phalin complained of continued pain in her feet and nausea. (Tr. 270) She also complained of difficulty eating and insulin intake due to gastroparesis. Dr. Falck-Ytter noted that Phalin had poor diet choices and did not exercise. Dr. Falck-Ytter recommended that Phalin visit a diabetes website and attend smoking cessation classes. She also ordered a gastric emptying study. (Tr. 271) The results of the gastric emptying study were normal with 7% retention after 4 hours. (Tr. 275)

Treatment notes in November 2013 and February 2014 indicate that Phalin was not at risk for falling. (Tr. 237, 262)

Plaintiff went to the emergency department complaining of lower abdominal pain on December 10, 2013. Phalin reported that her sugars had been well maintained except for an incident of low sugar that morning. (Tr. 250) Neurological and extremity examinations were normal. (Tr. 251) Phalin was discharged with a diagnosis of yeast infection. (Tr. 252)

Phalin went to the emergency room on July 4, 2014 complaining of suprapubic pain after discovering that she was pregnant. (Tr. 787) Phalin's gait was documented as steady, without

4

assistance. (Tr. 553) Neurological and extremity examinations were normal. (Tr. 789) Phalin was diagnosed with abdominal pain and pregnancy. (Tr. 790)

On July 7, 2014, Phalin presented for a maternal fetal medicine consultation. (Tr. 561) She had an elevated $A_1c$ level and was counseled that uncontrolled diabetes could cause risks to her pregnancy and to her long-term health. (Tr. 561) Phalin was not at risk for falls. (Tr. 560) Phalin maintained good control over her blood sugars during her pregnancy. (Tr. 749, 758-759, 761, 784, 984, 1030, 1103, 1282, 1310, 1342, 1681)

In August 2014, Phalin went to the emergency department complaining of headaches and right flank pain. She was concerned about developing preeclampsia. (Tr. 618) Phalin reported that her blood sugar was well controlled. Examination was generally normal and Phalin had a normal gait. There was no sign of acute abdominal pathology. (Tr. 619)

Phalin went to the emergency department again in early September 2014 complaining of nausea and vomiting. (Tr. 636) Examination was generally unremarkable except for mild epigastric pain and abdominal tenderness. (Tr. 638) She was able to move all extremities and had no focal neurological deficits. (Tr. 638) The attending doctor concluded that Phalin's vomiting was pregnancy related. (Tr. 639)

At an obstetrics appointment on September 2, 2014, Phalin reported being independent in her activities. (Tr. 670)

Phalin returned to the emergency department on September 18, 2014 with complaints of abdominal pain. (Tr. 689) Examination showed normal range of motion of all extremities and intact strength and sensation. (Tr. 690) The attending physician believed that Phalin's symptoms were likely secondary to cholelithiasis (gallstones.) (Tr. 690)

5

On September 26, 2014, Phalin underwent laparoscopic open cholecystectomy (Tr. 728-729, 930) after an ultrasound showed cholelithiasis and gallbladder polyp. (Tr. 738)

Treatment notes from October and December 2014 show that Phalin was not at risk for falls. (Tr. 877, 1049, 1253)

In April 2015, Phalin went to the emergency room with complaints of headache and chest pain. (Tr. 1620) She reported that her sugars had been high despite being compliant with insulin. (Tr. 1621) Examination showed full range of motion in her extremities and normal strength and sensation. (Tr. 1622) Phalin was discharged after her blood sugar returned to normal. (Tr. 1623)

In October 2015, Phalin began treating with Nurse Practitioner Susan Lyons. (Tr. 1681) Phalin reported painful neuropathy and retinopathy. She stated that her best glucose levels had been during her pregnancy when she counted carbohydrates and used NPH and Lispro. Phalin reported caring for her 9 month old infant at home. (Tr. 1681) Phalin had a normal neurological exam with no obvious sensory or motor deficits; she had normal reflexes in her upper and lower extremities. (Tr. 1683) Ms. Lyons noted that Phalin's diabetes was "uncontrolled with apparent improvement over the past couple of months." (Tr. 1683)

Phalin followed up with Nurse Lyons on November 5, 2015. She continued to complain of painful neuropathy. Neurontin and Lyrica had not alleviated leg pain. (Tr. 1688)

Phalin was referred to Dr. Nicholas Zakov at Retina Associates of Cleveland for diabetic macular edema (fluid on eye) and blurred vision more in the left eye. (Tr. 824-829) Dr. Zakov diagnosed diabetes, type I, with ocular complications. (Tr. 827) A fluorescein angiogram showed leakage in both eyes from patches of microaneurysms. (Tr. 825) Dr. Zakov explained to Phalin that she had diabetic retinopathy and that this could be a serious, progressive and blinding

6

disease. He recommended focal laser treatment for her blurred vision, which she underwent on November 20, 2015. (Tr. 825, 827)

On November 12, 2015, Phalin had an initial consultation with Cleveland Clinic neurologist, Dr. Luzma Cardona. (Tr. 1660) Phalin's chief complaint was neuropathy. She reported poor results with Gabapentin, Cymbalta, and Lyrica. (Tr. 1660-1661) The neurological examination was significant for decreased sensation to light touch, vibration, temperature, and pinprick to the lower extremities, worse distally, with abnormal proprioception in the right foot. Phalin had normal muscle tone, bulk and strength in all extremities and a normal gait. (Tr. 1661) Dr. Cardona diagnosed neuropathy due to unstable diabetes mellitus type 1. (Tr. 1662) He prescribed Effexor and requested blood work and EMG/NCS. (Tr. 1660)

Phalin met with endocrinologist, Dr. Dorota Whitmer, on November 30, 2015. (Tr. 1671) Phalin complained of painful paresthesias in the lower extremities. (Tr. 1668) Her $A_1c$ measures for August 2015 were 9.4% and 8.3% for November 19, 2015. Phalin denied blurred or double vision or eye pain. (Tr. 1671) Dr. Whitmer diagnosed uncontrolled type 1 diabetes complicated by retinopathy, nephropathy, and peripheral neuropathy. (Tr. 1672) Dr. Whitmer adjusted Phalin's insulin and prescribed twice daily Metformin. Dr. Whitmer opined that Phalin would be a candidate for insulin pump therapy. (Tr. 1673)

### C. Opinion Testimony - State Agency Reviewing Physicians

On July 4, 2014, Gary Hinzman, M.D., reviewed Phalin's records and found that Phalin's primary impairment of diabetes mellitus was non-severe. (Tr. 57) In the credibility assessment, he opined that Phalin's complaints of numbness and tingling in the feet/legs were "reasonably expected" given the diagnosis of diabetes mellitus. (Tr. 58)

On reconsideration, Dr. Diane Manos reviewed Phalin's records on October 31, 2014 and agreed that Phalin's diabetes was non-severe. (Tr. 73) She stated that Phalin's impairment "does not significantly limit physical or mental ability to do basic work activities." (Tr. 74) The last treatment note reviewed by Dr. Manos was dated October 28, 2014 from MetroHealth Medical Center. (Tr. 70)

### D. Testimonial Evidence

#### 1. Phalin's Testimony

- Phalin last worked in 2011 cleaning houses and office buildings. She was fired from that job because she couldn't concentrate due to pain. (Tr. 35) Before that, she worked at Walmart as a cashier. (Tr. 36)

- Phalin was no longer able to do anything around the house. (Tr. 36-37)

- Phalin was able to do some things for her 3 year-old daughter and 1 year-old son, but she had help taking care of them. (Tr. 37)

- Phalin was able to bathe herself and dress herself, but did little else. (Tr. 38)

- Phalin never had a driver's license and was afraid to drive. She got rides from other people when she needed to go somewhere. (Tr. 39)

- Phalin was diagnosed with diabetes nearly 20 years ago. She had complications with vision and balance. (Tr. 39, 41, 44)

- Despite taking medication, her blood sugars were not well controlled. (Tr. 44)

- Phalin had problems with her vision. She had laser surgeries for both eyes, but the surgeries did not help. (Tr. 39-40)

- Phalin started using a rolling walker a week before her hearing. Her physical therapist told her to start using it because she was having balance problems. (Tr. 41)

- Phalin had pain due to neuropathy in her feet, legs and hands. (Tr. 41)

- She felt that she would not be able to walk very far. (Tr. 43) She also had pain with sitting. (Tr. 44) Pain medication was not helping. (Tr. 43)

- Phalin also testified that she had been diagnosed with gastroparesis. (Tr. 45)

8

### 2. Vocational Expert – Jessica Christensen

Jessica Christensen, a vocational expert ("VE"), also testified. (Tr. 47-51)

- She considered Phalin's past work to be a cashier, checker. (Tr. 49)

- She was asked to consider a hypothetical individual of Phalin's age, education, and past work experience with no documented limitations. (Tr. 49)

- Ms. Christensen testified that this individual would be able to perform Phalin's past work.

- When the hypothetical individual was limited to sedentary work she would be able to perform the jobs of inspector, final assembler, and charge account clerk. All of these positions existed in significant numbers in the national economy. (Tr. 50)

- If the hypothetical individual was off task on average 20% of the time, she would not be able to work. (Tr. 50) The average employer tolerated an employee being off task no more than 10% of the time. (Tr. 50)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.   The ALJ's Decision

The ALJ's April 8, 2016 decision stated:

1. Phalin met the insured status requirements of the Social Security Act through December 31, 2015. (Tr. 19)

2. Phalin had not engaged in substantial gainful activity since October 1, 2011, the alleged onset date. (Tr. 19)

3. Phalin had the following non-severe impairments: diabetes mellitus, obesity, diabetic neuropathy, diabetic retinopathy, macular edema, hyperlipidemia, hypertension, hypothyroidism, celiac disease, gastroparesis and cholelithiasis. (Tr. 19)

4. Phalin did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 22)

5. Phalin had the residual functional capacity to perform a full range of work at all exertional levels with no documented limitations. (Tr. 22)

6. Phalin was able to perform past relevant work as a cashier/checker. (Tr. 23)

The ALJ determined that Ms. Phalin had not been under a disability from October 1, 2011 through the date of the decision. (Tr. 24)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Step Two Non-Severe Finding

Phalin argues that the ALJ erred in finding that her diabetes, diabetic neuropathy and diabetic retinopathy were not severe impairments at step two. At Step Two, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered non-severe when it "does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). The Regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs," which include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b) and 416.921(b).

The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §§ 404.1520a(d), 416.920a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."

*Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 SSR LEXIS 10 (July 2, 1996).

> The ALJ discussed Phalin's diabetes and diabetic neuropathy at step two of her decision:
>
> The claimant alleges disability due to diabetes mellitus and diabetic neuropathy. The claimant testified that she has persistent diabetic nerve pain, which impedes her ability to concentrate. The claimant testified that diabetic neuropathy causes her to drop items that she holds with her hands. The claimant's testimony alluded to further functional limitations due to diabetic neuropathy in her lower extremities, including her feet.
>
> The claimant has a diagnosis of uncontrolled type I diabetes. (Exhibit 1F, p. 2). During June and October 2013, the claimant had A1C measures above eight. (Exhibit 3F, p. 38). The medical evidence of record indicates that the claimant has continued to have elevated blood glucose levels throughout the relevant period. (Exhibit 1F, *et seq.*). During 2013, the claimant reported some back pain, but treatment records continually indicate that the claimant reported neuropathic pain in her feet. (Exhibit 4F, p. 3) However, on April 18, 2013, the claimant denied any neurological symptoms. (Exhibit 3F, p. 140). On May 17, 2013, neurological examination was normal. (*Id.* at 113) In July 2013, the claimant was determined to not be a risk for falling and she was able to ambulate independently. (*Id.* at 73, 94). In August 2013, the claimant reported performing independently at home, but with difficulty. (*Id.* at 74) Neurological examination in December 2013 revealed no evidence of acute focal neurological deficits. (*Id.* at 19).
>
> For the rest of the relevant period, the evidence regarding the claimant's diabetes and diabetic neuropathy shows much of the same and there is no evidence of any significant functional limitations. In July 2014, the claimant complained of numbness in her fingers and toes (Exhibit 6F, p. 30), but in September 2014, the claimant denied any neurological symptoms. (*Id.* at 104). In December 2014, it was again noted that the claimant was not at a risk for falling. (Exhibit 11F, p. 174). Neurological examinations during 2015 indicated no functional deficits. (Exhibit 11F, pp. 656, 747; Exhibit 13F, pp. 3, 18).

(Tr. 22)

The ALJ pointed to evidence in the record to support her conclusion that plaintiff's diabetes and diabetic neuropathy were not severe. However, there were several records documenting Phalin's complaints of pain and symptoms of diabetic neuropathy. (Tr. 363, 333, 1688) In November 2015, treatment notes state that Phalin's sensation was decreased to light touch, vibration, temperature and pinprick in lower extremities, worse distally, and proprioception was abnormal in right foot. (Tr. 1662) The ALJ acknowledged that Phalin had continued to have elevated blood glucose levels throughout the relevant period. (Tr. 20) This alone suggests that Phalin's diabetes was uncontrolled and may have had an impact on her ability to work. And the ALJ was not completely accurate in her recitation of the records supporting her decision. For example, the ALJ stated that Phalin denied any neurological symptoms on April 18, 2013. However, the record cited by the ALJ states that Phalin was positive for "numbness or tingling of feet." (Tr. 372)

The ALJ relied heavily on records from 2013. She also relied on the opinions of the state agency reviewing physicians who reviewed records through October 2014. But later records reviewed by the ALJ show that Phalin's $A_1c$ levels were uncontrolled and suggest that Phalin's complaints of neuropathic pain were worsening. (Tr. 1688, 1660-1661, 1668)

Phalin's testimony at the administrative hearing also supported a finding that her diabetes and diabetic neuropathy were severe. She used a rolling walker at the hearing. (Tr. 41) She stated that she was unable to walk very far, concentrate, or to sit for long periods. (42, 44)

The ALJ determined that Phalin's statements regarding the intensity, persistence and limiting effects of these symptoms was not entirely consistent with the medical evidence and other evidence in the record "for the reasons explained in this decision." (Tr. 22) However, the ALJ did not point to any specific records supporting her credibility determination. Social

15

Security Ruling 96-7p also requires the ALJ to explain her credibility determinations in her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*.  In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence.  *Id.*  Credibility determinations are for the ALJ, and not the reviewing court.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981).  Nonetheless, in determining whether Phalin met the *de minimis* burden at step two of the sequential evaluation, her testimony, even if not fully credible, supported a finding that her diabetes and diabetic neuropathy were severe. Medical records and Phalin's testimony showed that these impairments were having more than a minimal impact on her basic work activities such as walking.

Once an ALJ determines that one or more of the claimant's impairments are severe, she must consider all the claimant's severe and non-severe impairments in the remaining steps of the sequential analysis.  Because the ALJ determined that Phalin's impairments were all non-severe, she did not fully consider them separately or in combination in the remaining steps of the sequential analysis.  The ALJ determined that Phalin had the residual functional capacity to perform a full range of work at all exertional levels with no documented limitations.  (Tr. 22) However, had the ALJ properly determined that Phalin's diabetes and diabetic neuropathy were severe impairments, her analysis at the remaining steps of the sequential evaluation would likely have been different.

The ALJ erred in finding that Phalin's diabetes and diabetic neuropathy were not severe. The court cannot find this error harmless because nothing in the ALJ's decision indicates that these impairments were considered in formulating Phalin's RFC. Thus, the ALJ failed to follow the proper legal standards and remand is necessary.

**VII.	Conclusion**

Because the ALJ did not correctly apply the applicable legal standards and because the ALJ's reasoning did not build an accurate and logical bridge between the evidence and the results of her decision, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: April 27, 2018

Thomas M. Parker
United States Magistrate Judge